HELTON v. STATE.

(*Knoxville*, September Term, 1952.)

Opinion filed February 6, 1953.

Rehearing denied March 6, 1953.

Petition for Certiorari in Supreme Court of United States denied October 12, 1953.

RAY L. BROCK, JR., RAYMOND A. GRAHAM and MAURICE M. WEAVER, all of Chattanooga, and JOHN J. HOOKER, of Nashville, for defendant.

NAT TIPTON, Assistant Attorney General, for the State.

See also 250 S. W. (2d) 540.

MR. JUSTICE PREWITT delivered the opinion of the Court.

The defendant, Eugene Helton, was convicted of murder in the first degree for the slaying of Mary Joy Delaney and his punishment fixed at ninety-nine years and a day in the state prison. He has appealed in error here.

The defendant is a man in his early forties and resides in Chattanooga. The record discloses that he is a man of considerable means.

The killing took place on August 23, 1950, about 7 p. m. in the apartment occupied by the deceased and her husband, Marion Delaney. There is no question of self-defense involved but the defendant Helton claims that

Delaney, the surviving husband, shot and killed his wife and that he had nothing to do with the shooting. The surviving husband Delaney testified as the principal witness for the state, stating that while he went to the kitchen in the apartment to get the defendant a drink of water, the latter shot and mortally wounded his wife, who was sitting on a divan in the room where he had just left. Mrs. Delaney was shot four or five times and died from the wounds in about two and a half hours thereafter in a hospital in Chattanooga. The deceased had formerly worked in a ten cent store in Chattanooga. She met the defendant and went with him for a number of years. On account of the relationship existing between the deceased and the defendant, the wife of Helton in 1944 procured a divorce from him. They lived apart for a while and then remarried at Hot Springs, Arkansas and returned to Chattanooga where the defendant was engaged in operating a tourist court near that city. Evidently the deceased became weary of this affair with Helton and married Marion Delaney. It seems that she feared the defendant even after she had married Delaney. There is no doubt that the defendant continued his relations from time to time with the deceased after she married Delaney and it is evident from the record that Delaney offered no special objections to Helton's attentions to his wife. These relations continued, and finally the three, Mr. and Mrs. Delaney and the defendant, made a trip to Daytona Beach, Florida. Evidently Mrs. Helton followed the three there and met the deceased and struck her some blows of a minor nature. Mrs. Helton came on back to Chattanooga and filed suit for divorce. These steps seem to have been taken on the day before the killing. The defendant received a copy of the divorce

bill and evidently it contained charges of misconduct with the deceased.

On August 23, 1950, a meeting had been arranged between the three to discuss the charges in the bill, according to the state's testimony. The defendant testified that the purpose of the meeting was to advise Delaney that he and the deceased were going away. The apartment of the Delaneys' was in an apartment house on Sixth Street in Chattanooga, on the second floor. The witness La Follette, who was living in one of the front apartments, testified that he was sitting on his front porch when he saw a station wagon driven by the defendant drive up. This witness testified that there was a pistol on the seat beside the defendant and that when he stopped the car, he took the pistol and went into the apartment; that a few minutes thereafter the shots were heard.

The principal witness against the defendant is the surviving husband of the deceased who testified that he and his wife were sitting on the divan in their living room discussing the charges in the divorce bill when the defendant came to the apartment and after a few minutes the defendant asked for a glass of water and that he went into the kitchen to get it. Delaney is corroborated in this by the testimony of two women who, after the homicide, went to the kitchen and found a tray of ice on the sink. Delaney testified that while he was in the kitchen he heard shots fired and rushed into the living room and saw the defendant go out the door with a pistol in his hand and the deceased lying on the divan apparently having been shot. The proof shows that one shot was fired and the deceased screamed and then there were three or four more shots. Almost immediately the police officers came and found Delaney holding the deceased in his arms, trying to comfort her. She

was shortly thereafter removed to a hospital where she died about two or three hours later.

After the shooting, an alarm was sent out to arrest the defendant and evidently a search was instituted for the pistol with which he is said to have committed the homicide. He was arrested about an hour and a half later—that is after the shooting—at his tourist court, by three county patrolmen, Bartlett, Nickens and Perkinson. All three testified that the defendant said that he had thrown his pistol in the river. He was then taken to the City Hall and there turned over to Captain Evatt, who was accompanied by the witness Anderson. Both these men testified that the defendant told them he had thrown his pistol in the river. The witness Smith, former homicide officer of the City Police Department, arrived on the scene shortly after the shooting and this witness testified that the deceased made the statement that the defendant had shot her. While at the hospital, Mrs. Morris, an aunt of the deceased, testified that the deceased made a dying declaration to her in which she stated that the defendant had shot her because she would not go with him.

The defendant testified that when he reached the apartment, Delaney and his wife were quarreling and that Delaney seemed to be in a bad humor and that while they were discussing the divorce trouble, after advising Delaney that they were going to leave together, he says that Delaney left the room in a few minutes, returned with a pistol and began to shoot and that he shot several times at the deceased. The defendant does not claim that Delaney ever undertook to shoot him nor does he deny the testimony of the witness La Follette that he had carried the pistol with him when he entered the apartment building.

The defendant testified that after the shooting, he went down the steps, got in the car and drove around and finally went back to his tourist court. He testified that while he was in the apartment, he saw a pistol lying on the chest of drawers in the hallway into which Delaney evidently went. He testified that the shots entered the side of the deceased rather than the front. Dr. Berezney, the intern at the hospital, testified that the deceased was irrational when he first saw her in the emergency room. Dr. Reisman, who attended the deceased, testified that the bullets entered from the side and Dr. Coulliette, a physicist at the University of Chattanooga, testified that he made an examination to determine the range of the bullet and corroborates the defendant's theory as to the position of the parties. Dr. Reisman also testified that the deceased was irrational when she reached the hospital. The mother of the deceased testified that Dr. Reisman showed them where the bullets entered the body and that they were in the front rather than at the side. Also the mother of the deceased and Mrs. Morris, the aunt, testified that they saw the bullet holes and that they were in the front of the body. An autopsy was had on the body of the deceased and examination was made by Dr. Adams, a pathologist of one of the Chattanooga hospitals. He testified that the body was in a good state of preservation and he located the entrance points in the front of the body. The x-ray technician who x-rayed the deceased after she was brought to the hospital testified that she was rational and understood the directions that were given to her in connection with the taking of the x-rays and cooperated with her in such taking.

■ So, it will be seen from the above statement of the facts and conditions that it was purely a factual question for the jury to determine which one of these

two men fired these deadly shots. We think that under the above statement the jury could well have come to the conclusion that the defendant Helton shot and killed the deceased and certainly the record shows no cause for his taking the life of this unfortunate woman. There is no showing whatever that she offered any resistance and the jury could well have come to the conclusion under the facts related to them from the witness stand that the defendant had made up his mind that Mrs. Delaney would go with him or suffer the consequences. Here the state has the testimony of the husband who related how his wife met her death; we have the further evidence that Delaney was preparing to bring the defendant a drink of water; we have the testimony of the witness Smith that the deceased told him a short time after she was shot that the defendant shot her, and again, the testimony of her aunt after the deceased reached the hospital that the defendant shot her and that the reason he shot her was because she would not go with him. Then, too, we have the testimony of five different officers who testified that the defendant stated shortly after the shooting that he had thrown his pistol in the river. Furthermore, we have threats shown in the record that Helton would take the life of the deceased if she did not go with him. It results that our conclusion is that the evidence does not preponderate against the verdict of the jury in favor of the innocence of the accused.

It is well settled in this state that cases of fact which involve the credibility of witnesses are considered settled by the verdict of the jury and approval by the trial judge. *Mahon* v. *State,* 127 Tenn. 535, 156 S. W. 458; *Ferguson* v. *State,* 138 Tenn. 106, 196 S. W. 140; *Turner* v. *State,* 188 Tenn. 312, 219 S. W. (2d) 188.

It might be stated here that after the defendant had been arraigned and the jury selected, there was a mistrial entered; later, he was tried again and this resulted in a hung jury and this conviction here followed in another trial.

It is insisted that upon the first trial, the judge erroneously discharged the jurors Parker and Brooks and thereby the defendant was placed in jeopardy and could not be further prosecuted. The record discloses that after the jury upon the first trial had been sworn in, it was discovered that the juror Parker had been rendered infamous and there was a hearing before the trial court. The state had challenged Parker because it appeared that he had been convicted of an infamous crime but the defendant insisted that this was a cause propter defectum and not propter affectum and did not justify the trial court to discharge a juror.

(3) It is conceded by the state that a number of cases do hold that the infamy of a juror is properly a cause of propter defectum. However, the state insists that the defendant is not in a position to raise this question because no exception was made at the time of the action of the court. The minute entry reciting the discharge of Parker stated that the defendant excepted to his discharge but under such circumstances the bill of exceptions controls. *Percer* v. *State*, 118 Tenn. 765, 775, 776, 103 S. W. 780.

As to the juror Brooks, it seems that he was accepted as a juror upon a voir dire examination which stated that while he knew the defendant, he had never had any dealings with him and knew him when he saw him. Later, the divorced wife of Brooks made an affidavit. This affidavit does not appear in the record but on the minutes of the court, it is recited that the affidavit

stated that this juror made the statement "as far as he was concerned Eugene Helton will not serve a day for killing Mrs. Delaney." This woman was examined as a witness and testified that her husband had been friendly with both Mr. and Mrs. Helton before the trial; that they had a vast number of contacts and that they had known each other for a long time and had visited each other and that when her husband was summoned for jury duty, he made the statement that he was summoned for the day that the Helton case came up and that he did not think that the defendant would get a day.

Although the first wayside bill of exceptions does not contain the voir dire examination of the jurors upon this trial on which Parker and Brooks were discharged, there is to be found in the record a statement by a grand jury which later investigated irregularities in drawing juries and in putting names in the jury box. Their comment in connection with the present case indicates what was happening. It is as follows:

"We were not able to establish the reasons for the irregularities in the jury panels for the early months of the year. The pattern for July is clearly discernible, however; To influence the outcome of the trial of Eugene Helton for murder. It is utterly beyond coincidence that at least 45 of the 84 persons illegally summoned for jury service during the term of court for which the Helton case was set should be connected with Eugene Helton or members of his family or members of his defense counsel in some manner."

Evidently the trial judge came to the conclusion that Brooks would not be a fair and impartial juror for the state and that he had misrepresented the personal relationship with the defendant. This juror on his voir

dire examination simply stated that he merely knew the defendant, while the testimony of Mrs. Brooks shows that he had many contacts with him and that they were very friendly.

We think the trial judge has ample authority upon the question of bias to discharge a juror.

"Certain conditions, if arising in the trial of a case, have come to be well recognized as constituting the occasion which will warrant the discharge of a jury, and, if they appear of record, will bar a plea of former jeopardy. These conditions are set forth in Wharton's Criminal Law, Vol. I, page 549, as: '(1) Consent of the prisoner; (2) illness of (a) one of the jurors, (b) the prisoner, or (c) the court; (3) absence of a juryman; (4) impossibility of the jurors agreeing on a verdict; (5) some untoward accident that renders a verdict impossible; and (6) extreme and overwhelming physical or legal necessity.' " *Etter* v. *State*, 185 Tenn. 218, 205 S. W. (2d) 1, 3.

The case of *Green* v. *State*, 147 Tenn. 299, 247 S. W. 84, 28 A. L. R. 842, clearly recognizes the right of the trial judge to exercise this function. In that case one of the jurors advised the court that he had conscientious scruples against inflicting punishment but thought the matter of punishment should be left to the hereafter. He was discharged and a new juror impaneled and this Court held that the trial judge was clearly within his rights in so doing. In this case the Court cites and discusses a number of cases from which the conclusion is drawn that it was early in judicial history that it was established that an accused might be put upon his trial a second time under conditions of necessity and that necessarily the trial court was clothed with sound discretion in determining whether the necessity existed.

This rule has been followed in numerous cases decided by the Supreme Court of the United States. *Simmons* v. *U. S.*, 142 U. S. 148, 12 S. Ct. 171, 35 L. Ed. 968; *Logan* v. *U. S.*, 144 U. S. 263, 12 S. Ct. 617, 36 L. Ed. 429; *Thompson* v. *U. S.*, 155 U. S. 271, 15 S. Ct. 73, 39 L. Ed. 146.

In the Green case [147 Tenn. 299, 247 S. W. 86] the Court said further:

"The general modern rule is that the court may discharge a juror without working an acquittal of the defendant in any case, where the ends of justice, under the circumstances, would otherwise be defeated."

And again the Court said in the Green case:

"Not only is the defendant entitled to the unanimous vote of all the jurors before he can be convicted, but the state is entitled to have the unanimous verdict of 12 jurors before he is acquitted. There was thus developed a situation wherein it was entirely impossible to secure a verdict, and we have presented a case where the discharge of a juror became a necessity in order to prevent a miscarriage in the administration of justice. Certainly this conclusion is entirely justified by the leading cases on the subject, especially of the Supreme Court of the United States, and fully meets the requirements of our own decisions and is in accordance with good sense and reason."

Quoting further:

"In the case of *Thompson* v. *U. S.*, 155 U. S. 271, 15 S. Ct. 73, 39 L. Ed. 146, supra, in which it developed that one of the jury had been a member of the grand jury that found the indictment and was discharged for that reason, the court said:

48

" 'Courts of justice are invested with the authority to discharge a jury from giving any verdict, whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and that the defendant is not thereby twice put in jeopardy.' "

In the Green case, supra, the Court discusses the older cases of *Ward* v. *State*, 20 Tenn. 253, through *Walker* v. *State*, 118 Tenn. 375, 99 S. W. 366.

So, in the instant case, it appears that the juror Brooks had not only formed an opinion in the case but he had prejudged it and certainly was not a fair and impartial juror. See *Simmons* v. *U. S.*, 142 U. S. 148, 12 S. Ct. 171, 35 L. Ed. 968; *State* v. *Hansford,* 76 Kan. 678, 92 P. 551, 14 L. R. A., N. S., 548; *Quintin* v. *State,* 112 Neb. 684, 200 N. W. 881.

In all of these cases the discharge of the juror and the entry of a mistrial was sustained against the contention that double jeopardy resulted.

"In our effort to see that the rights of persons accused of crime are protected, we should not overlook the fact that the people also have interests that should be safeguarded. Both the accused and the people have a right to have the case of the accused tried by an impartial jury." *Etter* v. *State*, supra.

We are therefore of the opinion that it was a legal necessity arising during the course of the trial that made it imperative that the juror Brooks be discharged.

■ It is also insisted that the lower court was in error in failing to grant the defendant a change of venue. We have examined the testimony pertaining to this mo-

tion and find that the court did not abuse its discretion in denying the motion.

█ It is also insisted that the trial judge erred in admitting the dying declaration of the deceased made to her aunt, Mrs. Morris. It is insisted that the declaration was erroneously admitted in that the sense of impending death was not sufficiently shown, nor the rationality of the deceased. In answer to this, it might be stated that Mrs. Morris testified that the deceased told her that she was dying. We can also look to the description of the wounds and that she died in a short time after the shots were fired. In determining the sense of impending death, we may look to the language of the deceased or infer from the character of the wounds as showing the consciousness of impending death. *Dickason* v. *State*, 139 Tenn. 601, 202 S. W. 922, 924.

█ There is no evidence in the record that the deceased ever entertained any hope of recovery.

In Dickason v. State, supra, it is said:

"The competency of a dying declaration is ordinarily a mixed question of law and fact. While this court, therefore, has power to review the action of the trial judge in such a matter, it being merely a question of the admissibility of evidence, we very seldom do so. Where the fact of the declarant's condition depends on the credibility of witnesses examined by the judge, great weight is to be attached to his conclusion. This court will not reverse, unless there is manifest error. Such is the rule in most appellate tribunals. Some hold the action of the trial court conclusive. Gipe v. State, 165 Ind. 433, 75 N. E. 881, 1 L. R. A., N. S., 419, 112 Am. St. Rep. 238; * * * Wigmore on Evidence, Sec. 1442; 1 R. C. L. 537, note, 8 Ann. Cas. 544.''

50

■ The record shows that the rational status of Mrs. Delaney was shown by the testimony of Mrs. Morris and the x-ray attendant and that the trial judge, having accredited them in the matter, his holding should not be disturbed.

■ It is also insisted that the lower court was in error in that he permitted the state to cross-examine the defendant extensively about his domestic affairs and his relations with his wife. Counsel for the defendant were undertaking to show before the jury the defendant as a faithful husband and father and no doubt for the purpose of engendering sympathy for him from that body. This being true, we think the state was privileged to cross-examine him with reference to these relations and to show that he had been arrested for nonsupport of his wife and children.

■ It is also objected that the testimony of Dr. Adams as to his findings in connection with the autopsy should have been excluded in that it was evidence in chief rather than in rebuttal. We have held that evidence of this type and its admission in rebuttal lies within the sound discretion of the trial court. *Hughes* v. *State,* 126 Tenn. 40, 148 S. W. 543.

■ It is also insisted that the trial judge was in error in overruling the defendant's challenge to the array. The Jury Commission Law of Hamilton County consists of Chapter 564, Private Acts of 1931. By it the jury commissioners are directed to obtain a list of qualified jurors from the magistrates and from such lists and tax books of the county and from other reliable sources of information to select the names of qualified veniremen.

After the investigation by the grand jury of the affairs of the Jury Commission of Hamilton County, which is mentioned in their report heretofore referred to in this

opinion, the three jury commissioners either resigned or were removed from office. The names contained in the jury box were removed. Three new jury commissioners were appointed, one of them the President of the University of Chattanooga. These three new commissioners faced an empty jury box and they seem to have placed in the box around twelve hundred names gathered from their own information. They seem to have requested lists from the magistrates but received only four or five from the eleven magistrates. They then proceeded by their use of various sources of information to place names in the jury box. There is no suggestion but that these commissioners made an honest effort to obtain enough names of qualified jurors by various types of inquiry among their acquaintances, civic organizations and the like to enable them to get a list of qualified persons and there is no suggestion that any improper influence was used in this respect. Complaint is made that since the statutes require that they obtain the lists from magistrates and from the tax books, the commission using the voting registration list violated this statute. No doubt the provision that the names of the jurors should be furnished by the magistrates was to give geographical representation. There is no question made here but that the twelve hundred names appearing in the jury box were gathered from different parts of the county. We think under this Jury Commission Law that the provisions referred to were directory and not mandatory. We therefore find no merit in this assignment of error.

 There is no merit in the assignment in which the Jury Commission Act for Hamilton County is claimed to be unconstitutional. It is insisted that the jury Commissioners are county officers and by Article XI, Sec. 17 of the Constitution, they are required to be elected by the

County Court or by popular vote. The case of *Davis* v. *Williams*, 158 Tenn. 34, 12 S. W. (2d) 532, is not in point. Jury Commissioners do not hold a county office but are a part of the judicial function of the courts of this state. They are analogous to the office of a Master in Chancery. Moreover, at common law the trial judge was authorized to select jurors. The creation of a Jury Commission to aid the court in the performance of this judicial function is not in violation of any constitutional inhibition.

We have examined all the assignments of error, find them without merit and they are all overruled. It results that the judgment of the lower court must be affirmed.