Howard BAILEY, alias, Plaintiff-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

Jan. 20, 1972.

Certiorari Denied by Supreme Court
April 17, 1972.

D. Bruce Shine, and Shelburne Ferguson, Jr., Kingsport, for plaintiff in error.

David M. Pack, Atty. Gen., Lance D. Evans, Asst. Atty. Gen., Nashville., Carl K. Kirkpatrick, Dist. Atty. Gen., Kingsport, for defendant in error.

## OPINION

OLIVER, Judge.

Indigent and represented by two court-appointed attorneys, Bailey was convicted of second degree murder in the Criminal Court of Sullivan County and was sentenced to imprisonment in the State Penitentiary for not less than 10 nor more than 20 years. He is in this Court upon his appeal in the nature of a writ of error duly perfected.

The indictment charged the defendant with first degree murder in the shooting death of Hattie Belle Tinsley. The court Minutes recording the trial show that he entered a plea of not guilty to murder but guilty of voluntary manslaughter. However, the Bill of Exceptions shows that he entered a plea of not guilty to murder but guilty of involuntary manslaughter. A settled principle of law in this State is that, in case of conflict between the Minutes and the Bill of Exceptions in such matters, the record recited in the Bill of Exceptions is controlling. Church v. State, 206 Tenn. 336, 333 S.W.2d 799; Helton v. State, 195 Tenn. 36, 255 S.W.2d 694. It is stated in the defendant's brief that his guilty plea was to involuntary manslaughter. It is appropriate to say in passing that trial judges and their clerks should exercise extraordinary care to avoid all such discrepancies.

By his first two Assignments of Error the defendant challenges the sufficiency of the evidence to warrant and support the verdict of the jury. The law is well settled in this State, and has been re-iterated in numerous cases, that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. Such a verdict removes the presumption of the innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn. Cr.App., 425 S.W.2d 799; Morelock v. State, Tenn.Cr.App., 460 S.W.2d 861.

This rule governing appellate review of criminal convictions makes unnecessary and, indeed, inappropriate, any detailed discussion of the evidence pro and con. Hargrove v. State, 199 Tenn. 25, 28, 281 S.W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

We summarize the material evidence. The deceased, separated from her husband, and the defendant were living together in a common-law relationship in his Kingsport apartment. While they were alone in the living room about 9:00 p. m. on January 12, 1970, he killed her with a single shot from a .25 caliber automatic pistol, the bullet entering her right temple. He immediately announced the killing to two friends who were sitting in the kitchen at the time, and then left the apartment with the gun without offering any explanation for what he had done. The friends, Elgin Wade and John Henry Johnson, observed no drinking or appearance of drinking by the defendant and the deceased, nor any quarreling or argument or evidence of trouble between them. After the defendant left, Johnson "rushed" to the nearby police station to report the matter.

Following Bailey's departure from his apartment, he went to the nearby home of

Leroy Goodwin. As a result of their conversation, Goodwin went to the defendant's apartment and observed the deceased sitting slumped over in a chair. Goodwin saw no gun in her hand. Some three or four minutes later the defendant returned to the apartment, entered through the kitchen and got a coat and returned to the porch where Goodwin was waiting and from there went on to police headquarters. When a Kingsport police officer arrived at the apartment about 9:40 that night, he found Hattie Belle Tinsley dead, sitting upright in a chair in the living room "with her head lying toward her right shoulder, and her right arm upon the floor," and the defendant's .25 caliber automatic pistol was in her right hand. The spent cartridge casing could not be found in the room. The safety device had been removed from the pistol. There were no signs of a struggle in the room.

When the defendant turned himself in to the police later that night, among the belongings he surrendered was a pair of brown leather gloves. A spent .25 caliber cartridge casing was in the little finger of the right glove, and there was a hole in the end of the third finger of the same glove.

It was stipulated that a .25 caliber bullet filed as exhibit five was removed from the deceased's head at autopsy.

McNair W. Perry, a firearms examiner in the Federal Bureau of Investigation Laboratory, was called as a prosecution witness. After relating all of his examination techniques, including test firing of the defendant's .25 caliber automatic pistol, he identified the stipulated bullet and the spent cartridge casing as having been fired by that gun. He also testified that he examined the defendant's glove to determine if there was any gunpowder residue in the third finger of the right glove—the one with the hole in the end of it; that no such residue was found; that he tested the whole area inside the glove; and that in his opinion the gun was not fired inside that glove. On cross-examination by defense counsel, Agent Perry testified that the absence of any gunpowder residue in the glove indicated that no weapon was fired in or through it and, in his opinion, that was conclusive evidence that the hole was not caused by the passage of a bullet; that "The passage of a bullet through the third finger of the right hand of the glove, had the muzzle of the gun been inside the glove, in my opinion, would have left considerable gunpowder residues, which would have shown up in the chemical test."

When the defendant was being placed in jail, he was charged with public drunkenness and was lodged in the "drunk tank." He had been drinking, in the jailor's opinion. He told the jailor, "Look at this bullet in my glove," and told him that a woman had shot herself. When the jailor asked him where he got that glove, the defendant said, "Over there where the woman shot herself."

Testifying as a witness in his own behalf, the defendant said that he and the deceased had been drinking all that day, and that night they and "the other two guys up here" had a little party. "So we'd been drinking, so I had to go to the store, like I say. So I had this gun that you see, and some gloves, which was laying on the couch—the arm of the couch. And so I had to go to the store before it got too late, so I says, 'Baby, I'm fixing to go.' As I—I picked up the gun—not the gun alone, it was inside the glove. I picked it up, and the gun went off, and so I looked—walked back towards the kitchen. I said, 'I believe I killed Hattie Belle, everything that I got.' Another guy got up and he come and looked, so I said, 'I don't know what to do.' So I went up to the alley and met another fellow and I asked him, 'What must I do?' He said, 'I don't believe it,' and so we came back. I said—he said, 'Best if you take that gun, they'll arrest you.' So I came back and disgusted—worried I didn't know what to do. I just took the gun and threw it down on the floor." He said that she was sitting in a chair and that he was standing between her and the

couch; that his pistol was in one of the gloves, and:

"Q That's what was laying on the couch?

A That's what was on the couch.

Q You picked up, and what did you do with them?

A I just slung them down. When I picked them up that's when the gun went off. I don't know if I—the hammer was already back on the gun.

Q What did she do?

A She just slumped over, like she was smiling and slumped over.

Q Like she smiled and slumped over?

A Slumped over.

Q Was the gun in the glove, Howard?

A Yes, sir.

Q Did you take the gun out of the glove in the alley?

A When we tried to unload it. Yes, sir. We did."

The defendant testified that when he left the apartment he started to the police station and met Sam Reeves in the alley and he took his pistol out of the glove and they tried to unload it and "It went off"; that Leroy Goodwin was staying at Sam Reeves' house; that he returned to his apartment to get his coat. He was then asked and testified further on cross-examination:

"Q To get your coat. All right. And how long did you stay at your house?

A I didn't stay there no time. Just go in there and throw that gun down on the floor and picked my coat up and go.

Q Did you go—you say you went in there and threw the gun down, where was your coat?

A My coat was in the bedroom.

Q It was in the bedroom. Did you throw the gun down in the bedroom?

A No.

Q Did you throw it down in the room where Hattie Belle was?

A I came in through my back door. My back door leads straight on into —back to the kitchen and front room. When I came in the door I had to turn to the left there. That's my bedroom. I just throwed the gun on the floor. I didn't—no purpose direction, I was just excited and just threw it down.

Q Just threw the gun down on the floor, and in which direction did you throw it?

A Well I couldn't say."

He denied that he put the gun in her hand.

■ Every homicide is presumed to be malicious in the absence of circumstances rebutting this implied presumption. Harper v. State, 206 Tenn. 509, 334 S.W.2d 933; Gann v. State, 214 Tenn. 711, 383 S. W.2d 32.

■ Killing with a deadly weapon raises a presumption of malice sufficient to justify a finding of murder in the second degree, in the absence of facts or circumstances rebutting that presumption. Nance v. State, 210 Tenn. 328, 358 S.W.2d 327; Gann v. State, supra; Bostick v. State, 210 Tenn. 620, 360 S.W.2d 472; Smith v. State, 212 Tenn. 510, 370 S.W.2d 543.

■ In such cases the burden is upon the State to establish that the killing constituted murder in the first degree, if such

is charged, and the defendant has the burden of showing mitigating facts and circumstances sufficient to reduce the degree of the homicide below second degree murder. So it is that malice is an essential ingredient of murder in the second degree. Harper v. State, supra; Smith v. State, supra. If one person, upon a sudden impulse of passion, without adequate provocation, and disconnected with any previously formed design to kill, kills another willfully and maliciously, such killing is unlawful and is murder in the second degree. Malice is not necessarily confined to an intention to take the life of the deceased, but includes an intention to do any unlawful act which may probably result in depriving the party of life. It is not so much spite or malevolence to the individual in particular as an evil design in general, the dictates of a wicked and depraved and malignant heart. It may be either express or implied in law. Warren v. State, 44 Tenn. 130. See also: 1 Wharton's Criminal Law & Procedure (Anderson), § 63.

Of course it is fundamental that the jurors are the sole and only judges of the evidence, and of the weight to be given to the swearing of each and every witness in the case. The credibility of the witnesses, the weight and value of their testimony, the inferences to be drawn from their statements, and all factual issues raised by the testimony and evidence introduced—direct and circumstantial, are matters entrusted exclusively to the jury as the triers of the facts. Humphrey v. State, 187 Tenn. 377, 215 S.W.2d 791; Cole v. State, 187 Tenn. 459, 215 S.W.2d 824; Steele v. State, 189 Tenn. 424, 225 S.W.2d 260; Smith v. State, 205 Tenn. 502, 327 S.W.2d 308; Hardin v. State, 210 Tenn. 116, 355 S.W.2d 105. Thus, the jury has the duty and prerogative in homicide cases of determining the question of malice and whether or not the defendant proved facts or circumstances sufficient to rebut the presumption of malice arising from the fact of the killing. Gray v. State, 63 Tenn. 331.

Upon this record the jury could well find from the evidence that after the defendant fled the house following the shooting, he conceived the idea of planting his pistol in her hand to make it look like a suicide, and did so. He showed the jailor what he claimed was a bullet hole in his glove and told him a woman had killed herself. The jury must have considered it more than passing strange that, if the shooting was accidental, he fled the house without so much as attempting to minister to her, why he did not even check her pulse or touch her (he said he didn't do either) if he loved her so much and she was all he had (as he testified). As it had a right to do, the jury obviously rejected the defendant's unbelievable tale as an imposition on credulity. He has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

The sentence being within the statutory limits of punishment for murder in the second degree (T.C.A. § 39–2408), the Assignment that it was corruptly motivated by passion, prejudice and caprice on the part of the jury is untenable. Hunter v. State, 222 Tenn. 672, 440 S.W.2d 1; Yearwood v. State, Tenn.Cr.App., 455 S.W.2d 612.

Nor is there any merit in the fourth Assignment that the court erred in refusing to allow the defendant to introduce and play a tape recording of the preliminary hearing to impeach prosecution witness John Henry Johnson. There is nothing in this record to show that any such recording was ever made or that any such request or motion was ever presented to the trial judge.

Equally baseless is the fifth Assignment complaining that the trial court erred in not granting the defendant's request for the rule prior to the voir dire examination of jurors. This record does not show any request by defense counsel to exclude the witnesses under the rule prior to the selection of the jury. It does show

that such a request was made before the indictment was read to the jury, and was overruled. The court did not err in doing so. The witnesses were sequestered under the rule before the introduction of testimony began.

The sixth Assignment presses the defendant's complaint that the trial court erroneously sustained the District Attorney General's objection to his so-called hypothetical question to FBI Agent Perry concerning the spent cartridge casing found in the little finger of the defendant's right-hand glove. The question was: "Agent Perry, from your knowledge of chemistry and your experience, had the weapon been fired, in this gun, of this type, discharged the shell in the little finger, would it have left any residue?" The objection correctly pointed out that there had been no evidence of any such occurrence. The investigating officer testified that the spent casing was in the little finger of that glove when the defendant surrendered his gloves and other belongings at police headquarters. But there is no evidence in this record that the empty shell was ejected into the little finger of that glove by the discharge and operation of the pistol. Strangely enough, although the defendant was careful to take his gloves along when he left his apartment, neither at the police station nor in his testimony did he mention that the casing was in one of them—much less that it got there in the manner assumed by the question. Hypothetical questions may not be based upon assumed facts not in evidence. Fisher v. Travelers' Ins. Co., 124 Tenn. 450, 138 S.W. 316; Moon v. Johnston, 47 Tenn. App. 208, 337 S.W.2d 464. The trial court did not err in sustaining the State's objection. Further, as already noted, the FBI agent testified that the entire inside area of that glove was examined and tested for gunpowder residue.

The defendant's next Assignment is that his rights were prejudiced when the District Attorney General questioned him during cross-examination about prior convictions and held up an FBI listing of his convictions before the jury. At the very beginning of his direct examination, in response to questions by his own counsel, the defendant stated that he was convicted of larceny in 1956 upon a plea of guilty and of robbery in 1958. On cross-examination, the District Attorney General asked the defendant whether his robbery conviction was for armed robbery with a gun, to which he gave a negative answer. Overruling defense counsel's objection, the court ruled that the State could cross-examine the defendant concerning what he had testified to on direct examination "to show whether there is any inconsistency." The District Attorney General then inquired "Are we limited to the two felonies that he's mentioned?" Defense counsel objected "to that kind of a statement," and the court ruled that the State would not be so limited in cross-examination. Thereupon, the District Attorney General dropped the matter entirely. Under the circumstances, his cross-examination of the defendant was not improper. There is nothing whatever in the record to show that the District Attorney General displayed a list of the defendant's convictions before the jury, and upon the hearing of the new trial motion, the trial judge held that did not occur.

Finally, the defendant's contention that the District Attorney General made improper and prejudicial remarks in his summation to the jury is likewise unmeritorious. He complains about the District Attorney General's statement: "Lady and gentlemen, you can consider the fact that he is twice convicted," and the trial judge's failure to sustain his objection by saying only: "It may be permissible. I'll have to hear his argument. Go ahead, General." The record does not show that the District Attorney General pursued the matter any further. In view of the trial court's ruling, in the presence of the jury, upon the

District Attorney General's cross-examination of the defendant concerning his testimony regarding his two previous convictions, we cannot hold that the above-quoted limited reference in argument to the same two convictions prejudicially influenced the jury against the defendant.

■ It is also insisted that the defendant was prejudiced before the jury when the District Attorney General said in argument that ". . . we don't want him back—we don't want him back here in Sullivan County." In context, the District Attorney General's statement was: "We're not asking for the death penalty in this case. We're not asking for that. But we don't want him back—we don't want him back here in Sullivan County." The defendant should remember that by pleading guilty to involuntary manslaughter he admitted committing an offense punishable by imprisonment in the penitentiary, which would remove him from the county for a time.

So, even though the District Attorney General's jury arguments complained about were injudicious, we cannot say upon this record that the jury was corruptly influenced thereby to the defendant's prejudice. That is the test applicable in such cases. Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758; King v. State, Tenn.Cr.App., 430 S.W.2d 810; Shadden v. State, Tenn.Cr.App., 455 S.W.2d 164.

■ All Assignments of Error are overruled. The judgment of the trial court is modified by vacating that portion thereof which erroneously adjudged the defendant infamous. T.C.A. § 40–2712; Griffin v. State, 109 Tenn. 17, 70 S.W. 61; Brown v. State, Tenn.Cr.App., 441 S.W.2d 485. As thus modified, the judgment of the trial court is affirmed.

GALBREATH and MITCHELL, JJ., concur.