IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MAY 1998 SESSION

FILED

September 11, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9711-CR-00492 |
| | ) | |
| vs. | ) | Knox County |
| | ) | |
| TADARYL SHIPP, | ) | Hon. Mary Beth Leibowitz, |
| Judge | | |
| | ) | |
| Appellant. | ) | (First Degree Murder, |
| | ) | Conspiracy to Commit First Degree Murder) |

FOR THE APPELLANT:

M. CHRISTOPHER COFFEE
Attorney at Law
P.O. Box 870
Knoxville, TN  37902

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELIZABETH B. MARNEY
Asst. Attorney General
425 Fifth Ave. N., 2d Floor
Nashville, TN  37243-0493

RANDALL E. NICHOLS
District Attorney General

S. JO HELM
WILLIAM CRABTREE
Asst. District Attorneys General
P.O. Box 1468
Knoxville, TN  37901-1468

OPINION FILED:_____

CONVICTIONS AFFIRMED, CONSECUTIVE SENTENCES VACATED, AND REMANDED

CURWOOD WITT, JUDGE

OPINION

The defendant, Tadaryl Shipp, appeals the convictions of first degree murder and conspiracy to commit first degree murder that he received at his jury trial in the Knox County Criminal Court. Shipp is presently serving consecutive sentences of life and 25 years in the Department of Correction. In this direct appeal, he challenges the sufficiency of the convicting evidence and the propriety of the trial court's sentencing determination. Having reviewed the record and the briefs of the parties and having heard oral arguments, we affirm both convictions and sentences; however, we vacate the imposition of consecutive sentences and remand in order for the trial court to make the appropriate findings before determining whether the defendant will serve his sentences concurrently or consecutively.

The defendant's convictions stem from the 1995 "Job Corps murder" involving four students from the Knoxville Job Corps. The victim was Colleen Slemmer. The defendant and two young women have been convicted of her murder. Christa Gail Pike is on death row for her part in the murder. State v. Christa Gail Pike, No. 03C01-9611-CR-00408 (Tenn. Crim. App., Knoxville, Nov. 26, 1997) (Tenn. R. Sup. Ct. 12, § 2 review pending). According to the evidence of record, Shadolla Peterson pleaded guilty to being an accessory after the fact and received a six year probationary sentence.

A few days prior to January 12, 1995, the defendant told Kip O'Hara he

had to make a human sacrifice because the celestial bodies were in alignment. The defendant had a Ouija board with him when he had this conversation with O'l

On January 12, 1995, Daniel Wayland encountered Pike, Peterson and the defendant off the Job Corps campus. Pike and Peterson inquired whether Wayland had seen Slemmer, and the defendant said, "[W]hen we find her, she's dead." Wayland admitted, however, that he may have attributed this assertion to Pike in a previous statement to law enforcement, but he contended he was "shook up" at the time and his recollection had since improved. He said that Pike, Peterson and the defendant were all in agreement when the assertion was made.

On the day of the murder, Pike told Kimberly Ann Iloilo Rhodes that she was going to kill Slemmer. Pike also said she was looking for Peterson to get a box cutter from her.

According to the statement the defendant gave law enforcement shortly after the murder, Pike, Peterson, Slemmer and the defendant left the Job Corps campus at 8:50 p.m. and walked to Tyson Park. Pike confronted Slemmer about Slemmer's supposed romantic interest in the defendant. Pike made Slemmer take off her shirt. Pike became physically violent, hitting Slemmer. Peterson also struck Slemmer. As the confrontation escalated, Slemmer began grabbing the defendant, who pushed and slapped her. Pike began cutting Slemmer with a miniature meat cleaver. Pike was growing madder as the confrontation continued.

4

Peterson had a box cutter and joined Pike in cutting and stabbing the victim. Slemmer pleaded for the attack to end and promised she would walk to her home in Florida if she were released. The defendant admitted tripping Slemmer as she tried to run away, causing her to hit her head on a rock. The defendant also admitted cutting Slemmer three or four times, including on the arm with the box cutter. After Slemmer had been seriously injured, she was talking and screaming loudly. At Pike's request, the defendant went to see whether there was anyone in the area. While searching, he found a rag by a dumpster, which he tied over Slemmer's mouth to keep her quiet. Slemmer attempted to flee, but she fell in some mud. The defendant went to her and brought her back. Pike began hitting Slemmer with rocks. Peterson hit Slemmer with a brick or piece of asphalt. When Pike began hitting Slemmer with the rocks, the defendant became uncomfortable with the assault and walked down a hill but later returned to the scene to find Slemmer's head "all busted open on the side." Slemmer was gurgling and breathing. Pike and the defendant carved a pentagram in Slemmer's chest. The defendant helped Pike move Slemmer to a "hill of mud" with bushes and little trees around it. Peterson and the defendant threw Slemmer's shirt and jacket in the bushes. The three assailants washed their hands in a mud puddle. Then they went to a gas station, where Peterson and Pike washed again and threw away some of Slemmer's personal effects. The defendant said he returned to the Job Corps campus before Pike and Peterson, at 10:50. He said it took him 30 minutes to walk from Tyson Park to the Job Corps campus.

When Pike and Peterson returned to the Job Corps campus, Pike told

5

her friend Rhodes that she had killed Slemmer because she was afraid she was going to get caught. Rhodes thought Pike said the defendant had assisted in killing Slemmer, although she admitted having testified at Pike's trial that Pike said she killed Slemmer.

An employee of the University of Tennessee grounds department discovered Slemmer's body on the morning of January 13. University and Knoxville police officers responded to the scene.

During the afternoon of January 13, Pike and the defendant went to get identification cards from Robert Alfred Pollock, the Job Corps orientation specialist. Pike left her jacket in Pollock's office, and he later turned the jacket over to William Hudson, the Job Corps security supervisor. Hudson, in turn, surrendered the jacket to a Knoxville Police Department officer, who found a piece of skull bone in a pocket.

Jennifer McCrary testified that she and Pike went to Tyson Park on January 13. The police would not allow them to go into the area where they had planned to go. As they were walking on "The Strip," they saw the defendant coming toward the park. The defendant asked Pike why she was coming from the park, and the two began arguing. McCrary had walked away and could not hear the specifics of the argument.

Detective Randy York of the Knoxville Police Department interrogated

6

Pike and the defendant in the early morning hours of January 14, 1995. In addition to the contents of the defendant's statement summarized above, the defendant told Det. York that he had dabbled in satanism since he was ten years old.[1] He said Pike was "pretty deep" into satanic worship. Both he and Pike were wearing pentagram necklaces when they were taken into custody on January 14, and the defendant admitted he had satanic paraphernalia in his room at the Job Corps campus. The defendant was also wearing a hexagram earring and hat pin.[2] The defendant claimed, however, that the killing had not been a planned satanic offering. He said he carved the pentagram on the victim's chest and then thought that Slemmer could be a satanic sacrifice. The defendant claimed that in his mind the killing had nothing to do with the fact that the following day was Friday the 13th, "Devil's birthday."

The defendant professed to Det. York that he was unaware of any plan to kill Slemmer prior to the events taking place. Pike and Peterson told him they were going to "get [Slemmer] somewhere and do . . . whatever they could to her." He thought this meant they were "going to beat her up or something." He knew Pike and Peterson had the box cutter and miniature meat cleaver, but he thought they were "just going to scare her with them or something." He claimed he had no idea

---

[1] The defendant was seventeen at the time of his crimes.

[2] Detective York testified that he had been trained to recognize the pentagram as a symbol representative of a goat head. In satanism, the goat head represents Satan. The hexagram is a symbol for conjuring or controlling demons.

they were going to cut Slemmer.

Doctor Sandra Elkins, the Knox County Medical Examiner, performed an autopsy of the victim. Bruises on the victim's body were inflicted between 30 and 45 minutes prior to death. The numerous lacerations and slash wounds inflicted prior to death were insufficient to render the victim unconscious. The cause of death was blunt force trauma to the head. The victim's sinuses and lungs filled with blood following the head injury to the base of the skull, and she essentially drowned in her own blood.

DNA profiling of blood found on the shirt and pants the defendant wore on the night of the murder matched Slemmer's DNA profile.

I

In his first issue, the defendant claims the evidence is insufficient to sustain his convictions. When a defendant challenges the sufficiency of the evidence, an appellate court's standard of review is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct

evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning

the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the

trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

A. First Degree Murder

Once a homicide is established, it is presumed to be second degree murder. Witt v. State, 46 Tenn. (6 Cold.) 5, 7 (1868), overruled on other grounds, Campbell v. State, 491 S.W.2d 359 (Tenn. 1973). In order to elevate the offense to first degree murder, the state must prove premeditation and deliberation.[3] State v.

_____

[3]On January 12, 1995, first degree murder was "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1994) (amended 1995). The element of deliberation has since been omitted. See Tenn.

Brown, 836 S.W.2d 530, 543 (Tenn. 1992) (citing Bailey v. State, 479 S.W.2d 829, 733 (Tenn. Crim. App. 1972)).

At the time of this offense, the Criminal Code defined a deliberate act as "one performed with a cool purpose." Tenn. Code Ann. § 39-13-201(b)(1) (1991) (amended 1995). A premeditated act was one which was "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991) (amended 1995). Both premeditation and deliberation may be established by circumstantial evidence. See Brown, 836 S.W.2d at 541.

In pertinent part, an individual is criminally responsible for another's conduct if "[a]cting with the intent to promote or assist the commission of the

offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (1997).

The defendant's challenge to the sufficiency of his first

---

Code Ann. § 39-13-202(a)(1) (1997).

11

degree murder conviction centers on the proof of premeditation and intent. We are convinced, however, that both premeditation and deliberation were sufficiently proven to sustain the defendant's conviction based upon his criminal responsibility for the actions of Pike and/or Peterson.

In the light most favorable to the state, Pike told her friend Kimberly Rhodes she was going to kill Slemmer. The defendant confided to Kip O'Hara in the days prior to the murder that he had to make a human sacrifice because the celestial bodies were in alignment. On the day of the murder, he told Daniel Wayland that when he, Pike and Peterson found Slemmer she was dead. Pike and Peterson procured weapons prior to the confrontation with Slemmer. The defendant knew Pike and Peterson had weapons. Pike, Peterson and the defendant lured Slemmer to a remote area in or near Tyson Park. The three inflicted a chilling assault on Slemmer for 30 to 45 minutes. When Slemmer tried to get away, the defendant twice thwarted her escape. The defendant helped conceal the crime by checking to see if anyone was within earshot of Slemmer's screams and binding her mouth so that she would be unable to make noise. After Slemmer was mortally wounded, the defendant helped Pike move the victim to a brushy area and helped Peterson conceal the victim's clothing in

12

the bushes.  The next day, the defendant became upset with Pike for returning to the scene of the crime.

From this evidence, a rational jury could find the defendant criminally responsible for first degree murder based upon his aid to Pike and/or Peterson in the commission of the murder and his common intent to murder the victim.    See State v. Frank Whitmore, No. 03C01-9404-CR-00141, slip op. at 10 (Tenn. Crim. App., Knoxville, June 19, 1997) (defendant's guilt of first degree murder by criminal responsibility for conduct of another supported in part by defendant's participation in burglary during which murder was committed, failure to assist the wounded victim, and disposing of evidence); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (planning activity prior to the crime relevant to premeditation); Brown, 836 S.W.2d at 541 (facts relevant to premeditation include the use of a deadly weapon on an unarmed victim, a particularly cruel killing, and declarations of intent to kill the victim); State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982) (criminal intent may be inferred from presence, companionship, and pre- and post-offense conduct of defendant).

B.  Conspiracy to Commit First Degree Murder

A person is guilty of conspiracy where he acts with one

13

or more other persons, "each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, [and] agree[s] that one (1) or more of them will engage in conduct which constitutes such offense." Tenn. Code Ann. § 39-12-103(a) (1997).

The defendant claims there is insufficient proof that he entered into an agreement with Pike and/or Peterson to murder the victim. Although the defendant is correct to the extent that there is no direct evidence of an agreement, the record is replete with circumstantial evidence that the defendant conspired with Pike and Peterson. See State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993) (conspiracy may be proven by circumstantial evidence). In the light most favorable to the state, days before Slemmer's murder the defendant said he had to make a human sacrifice. The defendant and Pike carved a satanic pentagram on Slemmer's chest. Pike and the defendant were wearing necklaces bearing the same symbol when they were taken into custody. On the day of the murder, both Pike and the defendant made statements foretelling Slemmer's death. The defendant was accompanied by Pike and Peterson when he made his statement in this regard. Pike and Peterson procured weapons. The defendant

14

knew Pike and Peterson were armed, and he accompanied them and the victim to Tyson Park. The defendant participated in the horrific torture of Slemmer. When Slemmer tried to escape, the defendant tripped her once and brought her back another time so that he, Pike and Peterson could continue their assault. The defendant gagged Slemmer so she would not scream. A rational jury could find the defendant's claim of ignorance of Pike's and Peterson's plan incredible and accredit the state's evidence as strong circumstantial proof beyond a reasonable doubt that the defendant conspired with Pike and Peterson to murder the victim.

We find the evidence sufficient to sustain the defendant's convictions of first degree murder and conspiracy to commit first degree murder.

II

Next, the defendant challenges the maximum 25-year sentence imposed for conspiracy and the imposition of consecutive sentencing. In determining whether the trial court has properly sentenced an individual, this court engages in a de novo review of the record with a presumption that the trial court's determinations were correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the

15

trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our de novo review, we must consider the evidence at sentencing, the presentence report, the sentencing principles, the arguments of counsel, the statements of the defendant, the nature and characteristics of the offense, any mitigating and enhancement factors, and the defendant's amenability to rehabilitation. Tenn. Code Ann. §§ 40-35-210(b), 40-35-103(5) (1997); Ashby, 823 S.W.2d at 168.

In the appellate courts, the party appealing the sentencing determination has the burden of showing that it is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments (1997); Ashby, 823 S.W.2d at 169. A component of this burden is preparing a record "which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); Tenn. R. App. P. 24(b). If the record fails to contain necessary items with respect to an appellate issue, the court is precluded from considering the merits of the issue. State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993); Tenn. R. App. P. 24(b).

In the case at bar, the defendant has not included the presentence report in the record. Because this document is necessary for a de novo review of

16

the trial court's sentencing determination,[4] we are unable to review the sentencing issues on their merits. In this situation, a waiver of the sentence enhancement and mitigation issues and affirmance of the trial court's sentence length determination is the result. Oody, 823 S.W.2d at 559. However, we discern an error of law in the trial court's consecutive sentencing determinations, and we conclude in this case that justice is better served by remanding the case to the trial court for a new determination as to concurrent or consecutive service of the sentences.

We review questions of law *de novo*. State v. Davis, 940 S.W.2d 558, at 561 (Tenn. 1997). As part of such a *de novo* review, we conclude that the trial court's rationale for ordering consecutive sentences was legally erroneous.

In announcing its decision to order consecutive service of the defendant's sentences, the trial court declared the defendant a "dangerous offender". See Tenn. Code Ann. § 40-35-115(b)(4) (1997). The dangerous offender is one of the categories of offender for which consecutive sentencing is allowed. Tenn. Code Ann. § 40-35-115(b) (1997). However, in State v. Wilkerson, our supreme court

---

[4]Tenn. Code Ann. § 40-35-210(b); § 40-35-103(5) (1997); Ashby, 823 S.W.2d at 168.

17

held that merely finding the defendant to be a dangerous offender is an insufficient basis for ordering consecutive sentencing.  State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

> The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.

Id.  The record of the sentencing hearing reflects no attempt by the trial judge to consider or apply these two factors mandated by Wilkerson.  There were no findings of fact relative to these factors. On remand, should the trial court find the defendant to be a dangerous offender, it should follow the principles announced in Wilkerson in considering the use of consecutive sentences.

Because of the incomplete status of the sentencing record before us, we have not reviewed the trial court's sentencing determinations except for the  legal issue addressed above.  The absence of the presentence report precludes not only our further review of the other sentencing issues raised by the defendant but also precludes our taking any action on the consecutive sentencing issue other than remanding the case for new findings of fact and determinations.   We leave it to the trial court to determine, in its discretion, whether a further hearing is to be conducted or whether the necessary determinations should be made on the record that is

already before the court.

Accordingly, the convictions and sentences are affirmed, the imposition of consecutive sentences is vacated, and the case is remanded for the trial court to make appropriate findings of fact and to determine whether the sentences shall run concurrently or consecutively.

_____
CURWOOD WITT, JUDGE

CONCUR:

_____
JOSEPH M. TIPTON, JUDGE

_____
JOE G. RILEY, JUDGE