IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 11, 2000

## STATE OF TENNESSEE v. REGINALD MERRIWEATHER

**Appeal from the Circuit Court for Madison County**
**No. 98-549     John Franklin Murchison, Judge**

_____

**No. W1999-02050-CCA-R3-CD  - Filed March 6, 2001**

_____

The defendant appeals his jury convictions of attempted second degree murder, aggravated assault, and especially aggravated robbery. He raises the following issues: (1) whether the trial judge erred in denying defendant's request for a mistrial based on a juror's response during voir dire; (2) whether the trial court erred in directing a witness to answer questions on cross-examination; (3) whether the evidence was sufficient to support his convictions; and (4) whether the trial court erred in failing to instruct the jury as to certain lesser-included offenses. The judgment of the trial court is affirmed in part and reversed in part.

### *T. R. A. P. 3 APPEAL AS OF RIGHT*; Judgment of the Circuit Court AFFIRMED IN PART, REVERSED IN PART and DISMISSED IN PART.

CORNELIA A. CLARK, SP. J., delivered the opinion of the court, in which DAVID H. WELLES, J. and ALAN E. GLENN, J. joined.

J. Colin Morris, for the appellant, Reginald Merriweather.

Paul G. Summers, Attorney General, Mark E. Davidson, Assistant Attorney General, Jerry G. Woodall, District Attorney General, and Donald H. Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On April 17, 1998, James Thomas Wyatt was dating a woman named Elizabeth Smith, who lived in an apartment on Ridgemont Drive in Madison County. He had used crack cocaine earlier in the day. According to Wyatt, around 12:30 or 1:00 Miguel Miller and defendant Reginald Merriweather arrived at the Ridgemont Drive house. He had never met them before. They attempted to sell Mr. Wyatt some crack cocaine. Wyatt agreed to purchase cocaine, and Miller left to get it.

A few minutes later Wyatt and the defendant received a call to come to another residence[1] to purchase cocaine. The defendant went with Wyatt to that residence.[2] Wyatt waited in the living room while the two men went into a bedroom. A small boy also was present in the living room, watching cartoons on television. Wyatt testified that Miguel Miller and the defendant then gestured to him to come into a back bedroom. Wyatt understood that he was going to be handed cocaine when he arrived in the bedroom. However, he was instead confronted by Miller, who took a knife and slit Wyatt's throat. Wyatt asked why Miller had done this, and he responded, "Because I wanted to." Miller then slashed him in the stomach. Wyatt began to fall backward. Defendant Merriweather pushed him forward so that he would fall on a mattress instead of on the floor. At that point Mr. Wyatt lapsed into unconsciousness.

The next thing Wyatt remembered was being placed into the back seat of his own truck by Miller and Merriweather. While he was riding down the road in the back of the truck he heard one of the defendants say to the other, "We need to make sure this white m----- f----- is dead". The other defendant then slapped him in the head. The victim could not identify which man took which action, because he did not open his eyes during this time period. He wanted the defendants to think he was dead. Once again he lost consciousness.

Wyatt next remembered waking up in his truck and finding that he was locked in and had no keys. The truck had been wedged between some trees. His wallet containing $700.00 was missing. Wyatt finally managed to kick a window out of the truck and exit. He found two jackets in the tool box. He wrapped them around his wounds and walked toward the sound of a running lawn mower.

Gregory Allen Jeffries was mowing his lawn when he heard his dogs barking and observed a man he did not know standing in the middle of a field. He approached the man, Mr. Wyatt, and discovered that his neck was severely cut. Wyatt was very weak and bloody. Jeffries called for an ambulance, then placed Wyatt in the back of his own truck and drove him up to the main road to wait for medical personnel to arrive.

Deputy Chad Lowery of the Madison County Sheriff's Department was dispatched to the Jeffries home in Madison County to investigate a reported stabbing. When Deputy Lowery arrived he encountered Mr. Wyatt, who had suffered a severe cut on his neck and was bleeding profusely. Wyatt was holding an army jacket or some article of clothing to his neck to stop the blood flow. Wyatt appeared to be conscious at that time. Deputy Lowery also noticed another injury to Mr. Wyatt's chest. He assisted in placing Wyatt in the ambulance, then drove his car to the hospital. Doctors there immediately began to work on Mr. Wyatt.

---

[1]The residence was located at 121 Hickory Hollow Road, and had been occupied for about six months by Miguel Miller and the defendant.

[2]On direct examination Wyatt testified that he thought Miller left Ridgemont Drive first, and the defendant later rode with him from Smith's to the Hickory Hollow address. On cross-examination he admitted that he was not certain which man left first, and which rode later with him.

Wyatt was hospitalized for eight days. He suffered permanent paralysis to the right side of his face because of the cuts he sustained.

Sheriff David Woolfork testified that he participated in the investigation, which eventually led officers to Miguel Miller and the defendant. Woolfork conducted the initial interview of Miguel Miller. Miller gave his written consent for officers to search the Hickory Hollow residence. Miller gave a statement admitting his involvement in the stabbing and robbery. As a result, Miller was charged with attempted first degree murder, aggravated assault, and especially aggravated robbery. Miller eventually pled guilty to each of those offenses.

Investigator Anthony Heavner participated in gathering evidence from the crime scene and the truck. Blood was observed in both locations. Heavner obtained two knives that were hidden underneath the mattress in the defendant's bedroom. He also identified cocaine found in that room, and photographs taken of the crime scene.

Heavner also interviewed the defendant. The defendant signed a waiver of rights form before speaking. His statement was recorded and played for the jury at trial. Defendant told Detective Heavner that he first met the victim with Miguel Miller at a house on Ridgemont. Defendant then left and returned to the Hickory Hollow Road residence he shared with his girlfriend and Miller. A short time later Miller returned to the Hickory Hollow residence on foot. He then got a truck, left, and returned with Wyatt.

According to defendant's statement, Miller and Wyatt went into defendant's bedroom to "mak[e] some transactions". Defendant paid no attention to them, but remained in the living room, waiting for his young son to come in from school. Miller then called to the defendant to come to the bedroom. When defendant arrived in the bedroom, he found that Wyatt's throat had been cut and he was bleeding profusely. However, Wyatt was still conscious. He was saying his money already had been taken, and begging for his life. Defendant claimed he had no advance knowledge of Miller's actions.

Defendant stated to Heavner that Miller then asked for his help in disposing of Wyatt. Defendant acknowledged that he helped load Wyatt into the truck, then drove with him to a deserted field and hid the truck in some bushes. During that trip Miller gave defendant half of the money. According to defendant, he then jumped out of the truck and ran to a relative's trailer.

Miguel Miller testified for the defendant at trial. He stated that he met Wyatt at Ms. Smith's house, and that they got involved in doing drugs together. They smoked a gram of crack cocaine. According to Miller, defendant Merriweather was not present at the Smith residence.

Later Miller and Wyatt rode in Wyatt's truck back to Miller's house. Defendant was present there. Wyatt had agreed to buy more crack from Miller. Miller testified that he originally planned to rob Wyatt, and then decided to cut his throat. He testified that prior to executing it, he discussed the robbery plan with the defendant, who tried to stop him. Miller, high on cocaine, would not listen.

He stated that he used two different knives in the stabbing. Miller denied that defendant knew anything about his actions or assisted him in any way in the stabbing.

Miller testified that he asked Wyatt for his money while he was sitting on the bed immediately after the stabbing. By this time defendant had returned to the living room, and did not witness the robbery. Wyatt then passed out. Miller wrapped him in a blanket, carried him outside, and loaded him into the truck. Defendant again did not participate in this process. He was angry at Miller, and attempted to convince him to take Wyatt to the hospital. Miller refused. Defendant rode with Miller into the countryside to leave the victim and his truck. They left the truck and walked to the home of Miller's cousin.

According to Miller, Wyatt had only $100 with him. Miller claimed none of that money was given to the defendant. Instead, Miller gave defendant fifty dollars of his own money for rent that was due. The money was transferred at the house, before the robbery occurred. Miller also testified that defendant Merriweather did not smoke cocaine, although he did drink. Merriweather did not participate in the crimes in any way. Miller stated he planned the robbery from the beginning.

Miller acknowledged that he had already pled guilty in this case to attempted first degree murder, especially aggravated robbery, and aggravated assault.

During cross-examination Miller's testimony varied significantly from both his own testimony on direct examination and from defendant's written statement. He agreed that the stabbing occurred in defendant's bedroom rather than Miller's. He also stated that he obtained $200.00, rather than $100.00, from Wyatt. Miller reiterated that, when he told the defendant that he planned to rob Wyatt, defendant tried to talk him out of it.

However, when he was then asked if defendant had taken any steps to warn Wyatt of the planned robbery, Miller again changed his story. He stated that he did not advise defendant about the robbery in advance. He then became argumentative, refusing to answer the questions posed to him, demanding to know whether they had been posed to the defendant. On several occasions the trial judge instructed him to answer. Miller changed his testimony again, stating that he told defendant about the robbery in advance, and the defendant tried to stop him. Miller denied that defendant's son was present during the events in question. He also denied there were any drugs in the residence. When shown one of the photographs taken by police in defendant's bedroom, he first admitted cocaine was present in the defendant's room. However, he claimed it was his. Almost immediately, however, he returned to his position that there was no cocaine in the Hickory Hollow apartment.

The defendant testified on his own behalf. Contradicting Miller's testimony, he acknowledged first meeting Wyatt at Elizabeth Smith's house. He admitted drinking three or four beers while he was there, but denied using drugs. He said that he and Miller left together and returned to their residence. Miller left and returned to Smith's house. After ten or fifteen minutes he returned with Wyatt in a gray truck. Wyatt entered the house with Miller.

Defendant then testified that Miller called him to the bedroom and told him he planned to rob Wyatt. Defendant claimed he thought Miller was joking, because he was high on cocaine. Defendant saw his son approaching outside, so he left the bedroom where he understood the other two men would conduct a drug transaction. He first said he spoke to his son, then stated that he merely saw his son walking down the hill outside. Miller then called to him to come to the bedroom.

Defendant walked into the bedroom and found that Wyatt's throat had been cut. That sight made him panic, so he quickly ran outside and sent his son to a friend's house. Then he returned inside to the bedroom. He found Wyatt with blood gushing from his neck, conscious and saying, "I've done gave you all my money. Just don't do that no more." Miller picked Wyatt up, wrapped him in a blanket, and indicated he planned to put him in his truck. Defendant testified that he continued to try to stop Miller. He was standing by the truck when Miller threw Wyatt in. Wyatt's head "flopped out", throwing blood onto the defendant. Defendant pushed his head back in and got into the truck. Miller then drove off.

Defendant testified that he continued begging Miller to take Wyatt to the hospital. Miller was "acting crazy". They actually passed the hospital, but Miller would not stop. Miller drove to a field behind his grandparents' home and left Wyatt and the truck. Although he was scared of Miller, defendant followed him on foot to another house.

Concerning the money, defendant testified that Miller gave him $100 for rent, just as he did every week. He denied seeing Miller take money from Wyatt, or receiving any of Wyatt's money himself.

Defendant admitted that he did not warn Wyatt about the robbery plan because he did not believe Miller was serious. Defendant denied slapping the victim or saying they needed to be sure he was dead. Defendant asserted that both Wyatt and Miller had testified incorrectly about the events in question, probably because both were high on cocaine at the time. Defendant admitted that Miller often smoked crack cocaine, but was unaware that he sold it. Defendant admitted that he often drank beer and smoked marijuana with Miller.

Defendant denied that he had participated in any way in the crimes. He admitted he had several prior felony and misdemeanor convictions. He asserted that he had cooperated fully with law enforcement officers.

On cross-examination defendant confirmed the details of his prior convictions. He also admitted using marijuana, but denied using cocaine.

Defendant reiterated that he and Miller left Elizabeth Smith's house and returned to their own residence together. Miller then went back to Smith's and returned with Wyatt in Wyatt's truck. Wyatt sat down in the living room and Miller went back to defendant's bedroom. Miller then called defendant back and told him he planned to rob Wyatt. Defendant opposed this plan, then left the room as Wyatt entered. He did not mention the robbery plan to Wyatt as they passed. When he was

called back in a few minutes later, Wyatt's throat had been cut. Defendant then went and told his son not to enter the house. He denied that his son ever entered the house. He testified that Wyatt watched cartoons alone.

Defendant testified that he knew Miller kept a knife, but he did not see it prior to the stabbing. He did not warn Wyatt about the impending robbery because he did not believe it would happen. He vehemently denied being in the bedroom when the stabbing and robbery occurred. He also denied touching him or helping carry him to the truck. His only contact with Wyatt was to push his head back into the truck.

Defendant stated that he was in a panic from the time he first observed the injured Wyatt. He had gotten his life back together after serving several prison terms. He had a job. He knew he needed to get help for Wyatt. That is why he got into the truck with Miller. He admitted that he never phoned for help, even after leaving Miller. He denied receiving any of Wyatt's money, and said the reference to "half the money" meant half of the rent that was due. He continued to assert that he did not stay behind and go for help because he was in shock.

## I.

Defendant first contends that the trial court erred in denying his motion for a mistrial after a juror, Mr. Harris, allegedly tainted the entire jury pool with remarks concerning his inability to be impartial. The specific exchange complained of occurred at the very beginning of the assistant district attorney's voir dire of the potential jury panel:

> **MR. ALLEN:** **All right, let me make sure I have everyone in the right place. Mr. Harris, Mr. Brook and Ms. Cash and Ms. Rowland. I think I got everybody.**
> **Have each of you four been able to hear all of my statements and questions of your fellow jurors?**
> **I assume none of you know any of the people involved in this case. Or do you?**
> **Okay, Mr. Harris, you do.**
> **JUROR HARRIS:** **I've met him.**
> **MR. ALLEN:** **You have met Mr. Merriweather?**
> **JUROR HARRIS:** **Yeah, through a friend, you know, over at a house, over at somebody else's house.**
> **MR. ALLEN:** **You met him over at a friend's house?**
> **JUROR HARRIS:** **Yeah.**
> **MR. ALLEN:** **About how long ago has that been?**
> **JUROR HARRIS:** **I don't remember. A year or so ago.**
> **MR. ALLEN:** **Was this a close friend of yours whose house you were at when you met him?**
> **JUROR HARRIS:** **The lady was.**

MR. ALLEN: And did you, I guess, have a conversation with Mr. Merriweather that night or that day?

JUROR HARRIS: No. I just knew him through another person he was visiting with, a conversation with him.

MR. ALLEN: Have you seen or talked to him since that one occasion?

JUROR HARRIS: No.

MR. ALLEN: But you do know Mr. Merriweather. Have you met any of his family or any of his associates or friends?

JUROR HARRIS: I know Mr. Merriweather, but I don't know any of his family.

MR. ALLEN: But you do know the Defendant.

JUROR HARRIS: Yeah, I've seen him.

MR. ALLEN: Do you think that might in some way affect your ability to make a fair and impartial decision in his case, the fact that you know him and met him?

JUROR HARRIS: I don't know. The way I know him, being the situation it was when I met him.

MR. ALLEN: All right. Something about the situation or the way that you met him that you think might make it difficult for you to serve as a fair and impartial juror?

JUROR HARRIS: Yes, it was.

MR. ALLEN: Without getting into what the details were, do you think it might?

JUROR HARRIS: It might, because – you know, like I said, because of the situation, you know, the way I met him and, you know, where the place was.

MR. ALLEN: Well, the bottom line is whether or not you can make a fair and impartial decision. And the reason we're asking you these questions is whether or not you think based upon your contact with him sometime in the past, because of the circumstances of that contact, is that going to play a part in that decision?

JUROR HARRIS: I don't know. It may not, you know.

MR. ALLEN: But you're just not sure.

JUROR HARRIS: No, because, like I said, the situation, but I can hear the evidence.

MR. ALLEN: Okay. Anybody else know the Defendant or have any contact with him before?
I believe that's all.

THE COURT: Mr. Morris.

MR. MORRIS: Mr. Harris, are you saying you can't be impartial? Is that what I'm hearing?

JUROR HARRIS: Well, I'm just saying, you know, I wouldn't want to, you

|              |                                                                                 |
|--------------|---------------------------------------------------------------------------------|
|              | know, to do nothing to jeopardize, because like I say, I had met him –           |
| THE COURT:   | Let's don't get into any details about this.                                    |
| MR. MORRIS:  | I just want to know if you can be fair and impartial, that's all, and objective, and look at the facts in this case in particular, regardless of how you may or may not know Mr. Merriweather or where you were or whatever happened. Can you look at this case objectively and listen to the facts from the witness stand, follow the Judge's instructions, hold the State to its burden of proving the Defendant guilty beyond a reasonable doubt, go in the jury room and deliberate on this case? Can you do all that? |
| JUROR HARRIS:| Oh, I'm not sure I can do that, you know, honestly, because – like I say, because I knew him. |
| THE COURT:   | I take it that you understand you can't get into details on the matter, but there is something that's going to give you problems. I kind of can read that into it, right? |
| JUROR HARRIS:| Yes, sir.                                                                       |
| THE COURT:   | You're excused.  James C. Volner.                                               |
| MR. MORRIS:  | Your Honor, can we approach?                                                    |
| THE COURT:   | Yes.                                                                            |

(There was a conference at the bench, out of the hearing of the prospective jurors as follows.)

| MR. MORRIS:  | Your Honor, I've never faced a situation like this before, but I think I better make an objection. |
| THE COURT:   | On what?                                                                        |
| MR. MORRIS:  | Or ask the Court to consider a mistrial. Mr. Harris has tainted the whole jury pool. |
| THE COURT:   | Let's go out in the hall.                                                       |

(There was a discussion off the record; and jury selection continued without further objection.)

A mistrial shall be declared in criminal cases only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy only when a trial cannot continue, or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Initially, we note that the defendant has not preserved in the record the argument on the motion for mistrial. It is the appellant's duty to preserve an adequate record for purposes of appeal. Tenn. R. App. P. 24(b); *State v. Bennett*, 798 S.W.2d 783, 790 (Tenn. Crim. App. 1990). Failure to do so results in waiver of consideration of the issue on appeal, and a presumption that the trial court ruled correctly. *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

Second, no objection was made by defense counsel to the questions being posed by the prosecutor. Defense counsel himself asked a similar series of questions in the presence of the entire jury panel before deciding to present his motion. No request was ever made for individual voir dire. This failure to object also normally results in waiver of the issue. *See State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992).

Third, at no time during the course of the proceedings did defense counsel request any curative instruction to the jury about the possible prejudice that might have occurred. This failure, too, constitutes waiver of the issue. Tenn. R. App. P. 36(a); *State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App.), *per. app.* denied (Tenn. 1987).

Fourth, the motion for new trial does not specifically address this issue, asserting only that "defendant was not tried by an impartial jury". Since oral argument on the motion is not preserved in the record, we are unable to determine if this issue was specifically raised to the trial court. This failure also generally results in waiver of the issue. Tenn. R. App. P. 3(e).

However, a review by this court of the entire exchange reveals no clear prejudice done to the defendant during the questioning of the juror. The juror admitted that he had previously met the defendant at a friend's house, and had had a single conversation with him. He expressed uncertainty about his ability to be fair and impartial because of the "situation" when they met. While defense counsel speculated this was a reference to some improper activity, it might equally have been a simple reference to having met in a social situation and sharing mutual friends. Both trial counsel and the court asked the prospective juror not to recite any details, and he did not. Absent additional information, it is pure speculation as to what caused his discomfort, and is even more speculative to assume that other members of the potential jury panel would be more likely to assume a negative rationale rather than a positive one.

Generally, errors committed during the selection, summoning and empaneling of juries do not affect the validity of a verdict in a criminal case unless prejudice has enured to the accused. *See Helton v. State*, 195 Tenn. 36, 51, 255 S.W.2d 694, 700, *cert. denied*, 346 U.S. 816, 74 S.Ct. 28, 98 L.Ed. 343 (1953); *State v. Boyd*, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992), *per. app. dismissed* (Tenn. 1993); *State v. Elrod*, 721 S.W.2d 820, 822 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1986); *State v. Wiseman,* 643 S.W.2d 354, 359 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1982). The defendant has failed to substantiate his claim beyond mere speculation. He has not demonstrated that he was prejudiced by any error that was committed during voir dire. Without more, this court must conclude there was no manifest necessity for a mistrial and that the trial court did not abuse its discretion by refusing to grant a mistrial. This issue is without merit.

Defendant next contends that the trial court erred in its instructions to witness Miguel Miller during his testimony before the jury. This issue was not raised in defendant's motion for a new trial. Therefore, it is waived. Tenn. R. App. P. 3(e). However, defendant asserts that the judge's remarks constitute plain error and, as such, are subject to review. *See* Tenn. R. Crim. P. 52(a).

Miguel Miller, the original co-defendant in this case, was called by the defense during its case in chief. During cross-examination by the assistant district attorney, Miller engaged in a pattern of responding to the prosecutor's questions with questions of his own. His answers were unresponsive and contradictory on a number of occasions. On four separate occasions the trial judge asked the witness to answer questions specifically. The witness continued his unresponsive answers. The last exchange, challenged by defendant in his brief, was as follows:

> **Q.      You took his wallet? You got a problem there, Mr. Miller?**
> **A.      Do you have a problem?**
> **Q.      You got how much money out of his pocket?**
> **A.      I already told you that.**
> **Q.      Tell me again. I don't remember.**
> **A.      Yeah, you remember.**
> **THE COURT:      He asked how much money. Come on, Mr. Miller. How much money did you get from him?**
> **THE WITNESS:      He already know that. I ain't going to answer that again.**
> **THE COURT:      You're not?**
> **THE WITNESS:      He already knows the answer.**
> **THE COURT:      If you don't answer these questions, I'm going to tell those ladies and gentlemen to disregard every statement you've made. And if you want me to do that, that's what I'm going to do, every word that you say. A witness cannot get on the stand, give the testimony they want to and refuse to give it -- all of the testimony. So please –**
> **A.      What was the question again?**
> **THE COURT:      Please cooperate with us, Mr. Miller. I wish you would. If you don't, your testimony and you are both going out of here.**
> **Q.      How much money did you get from Mr. Wyatt?**
> **A.      $200.**
> **Q.      Okay. And you say you turned around and give him $50.**
> **A.      Of my check.**

Tenn. R. Evid. 611(a) provides that "a court shall exercise appropriate control over the presentation of evidence. . ." The propriety, scope, manner, and control of examination of witnesses is entrusted to the sound discretion of the trial court and will not be interfered with absent an abuse of that discretion. *State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994). The defendant never

objected to the judge's statement to the witness, never asked for the jury to be excused, never asked for a curative instruction, and did not include this matter in his motion for new trial.

A trial court may admonish a witness suspected of untruthfulness of the significance of lying under oath. *State v. Schafer*, 973 S.W.2d 269, 278 (Tenn. Crim. App. 1997). However, a trial court may not declare its belief the witness is being untruthful and threaten the witness with prosecution for perjury to such a degree that the witness changes his testimony to the detriment of the defendant. *Id.* at 278. When the trial court's actions exceed the bounds of an appropriate warning, "the defendant's right to a fair trial is compromised and the outcome of the trial brought into question". *Id.*

The witness in this case clearly evidenced, through his actions, that he did not intend to cooperate with the prosecutor's attempt to conduct cross-examination. He had to be admonished more than once. The trial judge merely attempted to require him to be more responsive. He did not exceed the bounds of an appropriate warning. No abuse of discretion occurred. There is no plain error. This issue is without merit.

III.

Defendant next contends that the evidence is insufficient to sustain his convictions of attempted second degree murder, aggravated assault, and especially aggravated robbery. When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in the testimony in favor of the state. *See State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994).

The defendant was charged with attempt to commit first degree murder. He was convicted of attempt to commit second degree murder. To obtain a conviction for this offense, the state must prove that defendant knowingly attempted to kill the victim. Tenn. Code Ann. §39-12-101 and §39-13-210.

To obtain a conviction for especially aggravated robbery, the state must prove (1) the defendant perpetrated an intentional or knowing theft of property from the person of another by violence or putting the person in fear; (2) the defendant accomplished the theft with a deadly weapon; and (3) the victim suffered serious bodily injury. Tenn. Code Ann. §§39-13-403(a) and 39-13-401.

To obtain a conviction for aggravated assault, the state must prove the defendant (1)

intentionally or knowingly committed an assault as defined in Tenn. Code Ann. §39-13-101 and, (2) caused serious bodily injury to the victim or used or displayed a deadly weapon. Tenn. Code Ann. §39-13-102(a).

A person may be convicted of each of these three offenses under a criminal responsibility theory. A defendant is criminally responsible as a party to an offense if the offense is committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Tenn. Code Ann. §39-11-401(a). A defendant is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist in the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense. Tenn. Code Ann. §39-11-402(2).

Both Miguel Miller and the defendant testified that Miller advised defendant in advance about his plan to rob the victim. The victim testified that the two men were together alone in the bedroom before he entered and that, immediately upon his entry, Miller attacked him with two different knifes, seriously injuring him, and took his money. He testified that the defendant assisted by directing his body to fall in a location where blood would not be spilled across the room. Both men then assisted in placing him in his truck, driving him to a deserted location, locking him in the truck, and leaving him there without assistance. One of the men commented to the other during the drive that they needed to be sure he was dead. Defendant also acknowledged receiving money from Miller shortly after Miller took money from the victim. He never warned the victim, called the police, or sought to get the victim any assistance. The victim was hospitalized for eight days and suffered partial paralysis to his face as a result of his injuries.

A verdict of guilty accredits the theory of the state and removes the presumption of innocence. While the testimony in this case was contradictory, the jury could have concluded, taking all evidence in the light most favorable to the state, that the defendant was criminally responsible for the attempted murder, aggravated assault, and especially aggravated robbery of the victim. The jury needed only to find that the defendant, acting with the intent to promote or assist the commission of the offenses, or to benefit in the proceeds of the offense, aided Miller in committing the offenses. Tenn. Code Ann. §39-11-402. The proof is sufficient to support the convictions on all three counts

However, although not raised by the defendant, we find ourselves constrained to reverse and dismiss the defendant's conviction for aggravated assault on the basis of plain error. *See* Tenn. R. Crim. P. 52(b). The defendant was indicted for attempting to murder the victim by using a knife[3] and for causing serious bodily injury by using a knife. These charges arose out of a single attack on a single victim. The dual convictions therefore raise double jeopardy issues.

_____

[3]The indictment originally stated that the defendant attempted to kill the victim with a gun, but the indictment was later amended to indicate the deadly weapon was a knife.

The Tennessee Constitution protects defendants from multiple punishments for the same offense. *See* Tenn. Const. Art. 1, 10; *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996). We must therefore determine whether the defendant's convictions for attempted murder and aggravated assault are, under the facts of this case, multiple convictions for a single criminal action and thereby constitutionally infirm. This determination requires a four prong inquiry: whether aggravated assault is a lesser included offense of attempted second degree murder under *Blockburger v. U.S.*, 284 U.S. 299, 304 (1932); whether the state relied on the same evidence to prove both offenses; whether there were multiple victims or discrete acts; and a comparison of the purposes of the statutes underlying the two offenses. *Id.* at 381. "[T]he results of each [prong] must be weighed and considered in relation to each other." *Id.*

This Court has already considered on at least two occasions the viability of convictions for attempted homicide and aggravated assault arising out of a single attack on a single victim. In *State v. Hall*, 947 S.W.2d 181, 183 (Tenn. Crim. App. 1997), the Defendant repeatedly shocked the victim with an electrical cord, apparently in an attempt to electrocute her. He was convicted of attempted second degree murder and aggravated assault. *Id.* at 182. This Court found that aggravated assault was not a lesser included offense of attempted second degree murder under the *Blockburger* test. *Id.* at 184. However, this Court further found that the evidence used to prove each offense was the same; that the offense was a single attack upon a single victim; and that both statutes sought to serve the same purpose: "to prevent physical attacks upon persons." *Id.* Accordingly, this Court reversed and dismissed the Defendant's conviction for aggravated assault. *Id.*

Similarly, this Court addressed convictions for attempted first degree murder and aggravated assault arising from a single attack on a single victim in *State v. Adams*, 973 S.W.2d 224, 226 (Tenn. Crim. App. 1997). In that case, the defendant shot the victim once: leading this Court to conclude that the same evidence was used to prove both offenses; there was "one discre[te] act and one victim;" and that, because both statutes were aimed at deterring assaultive conduct, "[t]he evil at which the offenses are directed" was the same. *Id.* at 229. Accordingly, although the *Blockburger* test was again failed, this Court reversed and dismissed the defendant's conviction for aggravated assault. *Id.*

We recognize that the Defendant's accomplice in this case stabbed the victim not just once, but twice. However, both stabbings took place at the same location and within moments of each other. In *Hall* we noted that, "while each specific shock was a discrete act, each was part of a single attack upon a single victim: *analogous to multiple stabbings or multiple gunshots*." *Hall*, 947 S.W.2d at 184 (emphasis added). Hence, we find that the two stabbings here do not indicate the commission of separate offenses. We further recognize that the Defendant's actions in abandoning the wounded and bleeding victim in a locked truck in a remote field might have provided an alternative basis for a conviction of attempted second degree murder. However, the Defendant was charged with attempting to commit the murder by use of a knife, not by secreting and abandoning the victim. The jury convicted the Defendant of the offense with which he was charged, and we are not in a position to determine his guilt of an offense which the jury had no opportunity to consider.

The case before us therefore demands the same conclusion that this Court reached in *Hall* and *Adams*. Although aggravated assault is not a lesser included offense of attempted second degree murder under *Blockburger*, the remaining three prongs of the *Denton* test point to a double jeopardy violation. The evidence used to prove both offenses was the same: Miller slashed the victim across the throat and across his stomach as the victim was waiting to purchase cocaine. There was a single victim subjected to a single attack, and the purposes of the statutes prohibiting attempted second degree murder and aggravated assault are the same. Accordingly, under our supreme court's decision in *Denton*, we reverse and dismiss the Defendant's conviction for aggravated assault.

IV.

The defendant finally contends that the trial court erred by failing to instruct the jury about the possible lesser-included offenses of criminal responsibility for facilitation of a felony and accessory after the fact. Tenn. Code Ann. §39-11-403. This issue also was not raised at trial or in the motion for new trial. Therefore, generally it is deemed waived. Tenn. R. App. P. 3(e).

Additionally, defendant in his brief does not cite any case law in support of his argument. His entire argument on this issue is:

> **IV. WHETHER THE COURT COMMITTED PLAIN ERROR BY NOT INSTRUCTION (sic) THE JURY OF THE LESSER INCLUDED OFFENSES OF CRIMINAL RESPONSIBILITY FOR FACILITATION OF A FELONY AND ACCESSORY AFTER THE FACT.**
>
> **It is the Defendant's position that the Court committed Plain Error by not instructing the lessor (sic) included offenses of Criminal Responsibility for Facilitation of a Felony and Accessory after the Fact. It is the Defendant's position that after all of the proof in this case, both of these instructions should have been submitted to the jury for their consideration. The Defendant argues that this is Plain Error under Rule 52(b) of the Tennessee Rules of Criminal Procedure.**

This failure, too, generally acts as a waiver of the issue. Tenn. Crim. App. R. 10(b). However, the defendant argues that this failure is plain error under Rule 52(b), Tenn. R. Crim. P.

### A. Accessory After the Fact

Defendant first claims the court should have instructed the jury about the offense of accessory after the fact. "A person is an accessory after the fact who, after commission of a felony, with knowledge or reasonable ground to believe that the offender has committed the felony, and with the intent to hinder the arrest, trial, conviction or punishment of the offender: (1) harbors or conceals the offender; (2) provides or aids in providing the offender with any means of avoiding arrest, trial,

conviction or punishment; or (3) warns the offender of impending apprehension or discovery." Tenn. Code Ann. §39-11-411.

In *State v. Hodgkinson*, 778 S.W.2d 54, 63 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1989), this court held that accessory after the fact is a separate offense, rather than a lesser-included offense of a felony committed by the perpetrator of a crime. *See Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964); *State v. Hoosier*, 631 S.W.2d 474, 476 (Tenn. Crim. App.) *per. app. denied* (Tenn. 1982). Since the defendant was not charged separately with this offense, the court was under no duty to instruct the jury about it. This assertion is without merit.

### B. Facilitation of a Felony

Trial courts are under a duty to "instruct the jury on all lesser grades or classes of offenses and all lesser-included offenses if the evidence will support a conviction for those offenses . . .", *State v. Cleveland*, 959 S.W.2d 548, 553 (Tenn. 1997). This duty exists even absent a request from the defendant. Allowing consideration of the lesser offenses and the lesser grades if the evidence supports guilt on those offenses, more evenly balances the rights of the defense and prosecution and serves the interest of justice. *Id.* at 553. The trial judge did, over the objection of the defendant, instruct the jury on criminal responsibility for the conduct of another. He was not requested to, and did not, charge facilitation of any of the felonies.

In *State v. Lewis*, 919 S.W.2d 62 (Tenn. Crim. App. 1995), this court ruled that "virtually every time one is charged with a felony by way of criminal responsibility for the conduct of another, facilitation of a felony would be a lesser included offense". *Id.* at 67. The panel concluded that "criminal responsibility for facilitation is a lesser degree than that for criminal responsibility for the crime itself based on the conduct of another". *Id.* at 68. In *State v. Langford*, 994 S.W.2d 126 (Tenn. 1999), our Supreme Court again touched on the subject, holding that "a trial court must instruct the jury on all lesser included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense". *Id.* at 128. This general statement, however, does not end our analysis.

Tenn. R. Crim. P. 30(b) provides that the parties are to be given an opportunity to object to (1) the content of jury instructions or (2) the failure to give requested instructions. The failure to make objections in these instances does not prohibit their being used as grounds in the motion for new trial. *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996). However, alleged *omissions* in the jury charge must be called to the trial judge's attention at trial or be regarded as waived. *State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986).

In contrast to an erroneous instruction or the failure to give a requested instruction, defense counsel cannot sit on an objection to an omitted charge and allege it as a ground in the motion for new trial. *State v. Deborah Gladish*, No. 02C01-9404-CC-00070, McNairy County (Tenn. Crim. App., Jackson, Nov. 21, 1995), *perm. app. denied* (Tenn., May 6, 1996).

We, nevertheless, have the authority to address the failure to charge appropriate lesser

offenses as plain error. Tenn. R. Crim. P. 52(b). Where there is evidence sufficient to support a conviction of a lesser included offense, the trial court must instruct the jury on the lesser offense. *See State v. Bolden*, 979 S.W.2d 587, 593 (Tenn. 1998). The trial court's duty in this regard is mandatory. *Id.* In this case, the evidence was sufficient to support convictions of facilitation of each of the charged felonies. The trial court therefore erred in failing to give this instruction.

However, while we find that the trial court committed error in its failure to charge criminal responsibility for the facilitation of the felonies, we further find that the error was harmless. In *State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998), our supreme court concluded that when a trial court fails to give a required instruction on a lesser included offense, reversal is necessary only where the error "affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice."

Here, the trial judge instructed the jury on attempted first degree murder and the lesser included offense of attempted second degree murder; aggravated assault; and especially aggravated robbery and the lesser included offenses of aggravated robbery and robbery. The jury convicted the defendant of attempted second degree murder, aggravated assault, and especially aggravated robbery. Even though the trial judge should have charged the jury concerning the defendant's criminal responsibility for the facilitation of each of these felonies,[4] we certainly cannot say that the trial court's error *affirmatively appears* to have affected the result of the trial on the merits. In other words, we cannot say that the jury *more probably than not* would have found the defendant guilty of criminal responsibility for the facilitation of any of the charged offenses if the jury had been given that option. Therefore, under *Williams*, we conclude that the error is harmless and reversal of the defendant's convictions for attempted second degree murder and especially aggravated robbery is not required.

Accordingly, for the reasons set forth above, we reverse and dismiss the defendant's conviction for aggravated assault. In all other respects, the judgment of the trial court is affirmed.

_____
CORNELIA A. CLARK, SPECIAL JUDGE

---

[4]Of course, had the jury convicted the defendant of criminal responsibility for the facilitation of both the attempted murder and the aggravated assault, only the conviction relating to the murder would be allowed to stand under the same theory by which we reverse the defendant's aggravated assault conviction.